# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TAMMY G. HOFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:13-cv-00826 |
| | ) | Judge Haynes |
| v. | ) | |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff, Tammy G. Hoffman, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act. On August 11 and 18, 2010, Plaintiff filed claims for DIB and SSI alleging an onset date of June 9, 2010 and citing her chronic spinal disc disorder and mental impairments. After a hearing, the Administrative Law Judge ("ALJ") denied Plaintiff's claims.

In sum, the ALJ evaluated Plaintiff's claim for DIB and SSI benefits using the sequential evaluation process set forth at 20 C.F.R. §§ 404.1520, 416.920 (Docket Entry No. 11, Administrative Record at 18-31).[1] At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her amended alleged onset date. Id. at 20. At step two, the ALJ determined that Plaintiff had severe impairments consisting of lumbar degenerative disc disease, fibromyalgia, major

---

[1]For clarity, the Court notes that its citations to the Administrative Record refer to the original page number contained in the Administrative Record.

depressive disorder, and bipolar disorder. Id. at 21. At step three, the ALJ found that Plaintiff did not prove an impairment or combination of impairments that met or equaled one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 22. The ALJ found that Plaintiff could alternate between sitting and standing and walking every hour; that she may frequently use her feet for foot controls, occasionally engage in postural activity; that she may not work around unprotected heights or other hazards; that she can perform simple and detailed, but not complex tasks; and that she can adapt to only occasional changes in the workplace. Id. at 24. The ALJ concluded that Plaintiff retained the residual functional capacity to perform less than a full range of light work. Id.

Citing vocational expert testimony, the ALJ also found that although Plaintiff could not return to her past relevant work, Plaintiff retained the capacity to perform jobs that existed in significant numbers in the economy. Id. at 29-30. The vocational expert testified that a hypothetical individual with Plaintiff's age, education, past work experience, and credible limitations could return to her past relevant jobs as a receptionist, motel clerk, and cashier. Id. at 77-79. The vocational expert also testified that other jobs existed in the national economy which Plaintiff is able to perform, and identified representative jobs such as office helper, general clerk, and table worker. Id. at 30. Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to disability benefits. Upon reconsideration, the Appeals Council upheld the ALJ's denial of benefits.

Before the Court is Plaintiff's motion for judgment on the administrative record (Docket Entry No. 26) to which the Commissioner filed a response. (Docket Entry No. 29). After review of the parties' motion papers and the administrative record, the Court concludes that Plaintiff's motion

2

for judgment on the record should be granted because of Plaintiff's combined impairments and the ALJ's error in declining to give appropriate weight to the opinions of Plaintiff's medical and mental health providers.

## A. Review of the Evidentiary Record

The Administrative Record reflects that Plaintiff is 49 years old and was graduated from high school with mostly Cs and Ds. Plaintiff has been employed since age 17 and her highest earning years were 1993-1994. (Docket Entry No. 11 at 167). Prior to 1997, Plaintiff worked primarily part-time and unskilled manual labor jobs for less than six (6) months. Id. at 162-172. Plaintiff was often fired due to her inability to perform the job. Plaintiff worked full-time as a front-desk worker at Wyndham Resorts in 1998 for less than six (6) months. Id. at 57, 60-61, 163. Because Plaintiff needs frequent breaks and to stand up and walk around due to her pain, she was unable to perform her duties and was terminated. Id. at 60-61.

In 1998, Plaintiff was a part-time grocery cashier earning $1,224.75, id. at 57-58, but after less than three months left due to her pain from standing. Id. at 60. From late 2010 to early 2011, Plaintiff was a part-time school cafeteria worker, earning $1,002.38, but was terminated within three months for her inability to stand, lift, push and pull, and her crying at work. Id. at 61-62, 170. After the birth of her child, Plaintiff stopped working from 2002-2004, but resumed working in 2004 until May 2011, when she was terminated from her last regular job. Id. at 21, 54-55, 167. Plaintiff's last job was as a part-time on call retail grocery stocker for a wholesale baker. In May 2011, Plaintiff was terminated for her inability to push and pull and her crying at work. Id. at 21, 55, 62, 167. In 2011, Plaintiff performed paid "make work" jobs for family members, id. at 59-60, 69-71, 222-23, 235-36, but the ALJ found these jobs were not substantial gainful activities. Id. at 28.

Plaintiff's medical history reflects that Plaintiff had increasing back pain after a March 2009 automobile wreck in which her automobile was rear-ended. Id. at 284-85. In April 2009, a lumbar MRI showed progression of disc bulge at L3/4 and L4/5, id. at 346-47, but in June 2009, Plaintiff's treating physician referred her to Dr. Eric Schlosser, a neurosurgeon, id. at 284-85, who found Plaintiff's back pain to radiate into her right hip. Id. at 277-79, 262-64. In July 2009, Dr. Schlosser recommended epidural steroid injections (ESI), id. at 257, that Plaintiff received in July, August, and September 2009. Id. at 291-293. By October 2009, however, the steroid injections failed to relieve Plaintiff's pain and Plaintiff was prescribed Percocet. Id. at 251.

In November 2009, a lumbar myelogram and a CT of Plaintiff's lumbar spine revealed minimal or mild disc bulges at T12/L1, L3/4, and L4/5, with mild to moderate bilateral foraminal stenosis at L3/4 and L4/5. Id. at 290, 294. The overall impression was "mild multilevel lumbar spondylosis; no significant central stenosis; foraminal narrowing at L3/4 and L4/5." Id. In late November 2009, Dr. John Nwofia, M.D. treated Plaintiff's pain that was aggravated by sleeping, sitting, standing, and walking. Id. On December 1, 2009, Plaintiff underwent a right-sided surgical laminectomy, foraminotomy, and right-sided discectomy at L4/5. Id. at 260. Dr. Eric Schlosser's diagnosis was: "lumbar disc displacement at L4/5 and lumbar radiculopathy, right-sided L5 nerve root." Id. at 260. Dr. Schlosser approved a medical management of Plaintiff's persistent pain by Dr. Nwofia. Id. Dr. Schlosser also found "a large disc bulge." Id. at 261. Dr. Schlosser found improvement in Plaintiff's back and leg pain, but described continued leg pain in Plaintiff's right leg "is not unexpected." Id. at 250.

After her surgeries, Plaintiff described her pain as precluding her from standing or sitting more than fifteen minutes at a time. Id. at 268-269. Plaintiff's pain interfered with her personal care

4

and prevented her from lifting all, but very light objects. Id. at 268. Despite her pain medications, Plaintiff slept less than 4 hours at night. Id. at 269.

By mid-January 2010, Plaintiff told Dr. Nwofia that her right leg pain had improved, but her low back pain persisted. Id. at 343. Plaintiff described persistent right elbow pain. Id. An MRI of her right elbow revealed chronic lateral epicondylitis. Id. at 352, 775. Dr. Nwofia administered a steroid injection in her right elbow and advised Plaintiff that if the injection did not help, to see a surgeon. Id. at 343. The steroid injection did not relieve Plaintiff's elbow pain and on February 5, 2010, Dr. Steven Larsen performed a right debridement and epicondylectomy. Id. at 775-776. Dr. Larsen applied an elbow splint and later a long arm cast on her right arm, that Plaintiff wore for six weeks. Id. at 776. In February 2010, Dr. Nwofia also administered four trigger-point injections in Plaintiffs right lumbar spine for her lower back pain. Id. at 341. Dr. Nwofia's diagnoses were: 1) congenital spondylosis lumbosacral region, 2) degeneration of lumbar or lumbosacral intervertebral disc, 3) lumbosacral neuritis or radiculitis, unspecified, and 4) spinal enthesopathy.[2] Id.

By April 2010, Plaintiff was undergoing physical therapy for her right arm, id. at 339, but also wore a Lumbar Sacral Orthosis (LSO) lower back brace.[3] Id. Plaintiff told Dr. Nwofia her pain control improved with medications, but she experienced numbing and tingling in her right leg and had lower back pain below her knee that caused Plaintiff difficulty sleeping. Id. Dr. Nwofia discontinued Percocet and started Plaintiff on Lortab and Neurontin, but also ordered a lumbar MRI

---

[2]Spinal enthesopathy is a condition resulting from ossification and degeneration of the paraspinal ligaments secondary to attrition. See http://www.emedicine.medscape.com "spinal entheseopathy." Imaging in Diffuse Idiopathic Skeletal Hyperostosis.

[3]See http://www.orthosurg.ucsf.edu "LSO" Lumbo-Sacral Orthosis. A brace that focuses immobilization and support on the lumbar spine.

and an EMG, bilateral lower extremities. Id.

In late April 2010, Plaintiff had a second MRI of her lumbar spine. Id. at 350. The MRI showed post-surgical changes from the previous right laminectomy at L4/5. Id. Dr. Nwofia found "There is a left and central L4/5 disc bulge, L5/S1 and L3/4 bulges as well." Id. at 336. The May 2010 EMG reported "sub-acute bilateral S1 radiculopathies." Id. at 337-38. Dr. Nwofia prescribed a series of bilateral and left L5 transforaminal epidural steroid injections (ESI) on June 9, 15 and 29, 2010. Id. at 330-36. Plaintiff experienced improvement in her right leg pain, but pain in her left leg remained and Plaintiff agreed to undergo a lumbar discogram. Id. at 329.

After the lumbar discogram on July 28, 2010, id. at 326-27, the surgeon noted "abnormal but painless L3/4 and L4/5 discs with complete posterior tears." Id. at 327. The discogram would not yield any pain despite annular tears at L3/4 and L4/5 posteriorly and bilaterally with mild to moderate foraminal stenosis. Id. at 324. In Dr. Nwofia's opinion, "[s]urgery is probably not going to help her" and advised Plaintiff to continue her pain medication regimen, including muscle relaxants, a TENS unit, and if her pain persisted, facet arthropathy. Id. On August 16, 2010, Dr. Nwofia's diagnosis was: (1) post-Laminectomy syndrome of lumbar region, (2) lumbosacral neuritis or radiculitis, unspecified, (3) degeneration of lumbar or lumbosacral intervertebral disc, and (4) lumbosacral spondylosis without myelopathy. Id.

By September 2010, Plaintiff reported continued cramping in her legs and feet, and a tender palpation over the lumbar facets. Id. at 413. Dr. Nwofia's diagnosis was: Spondylosis with Facet Arthropathy, id. at 410, for which Plaintiff consulted another neurosurgeon, Dr. Allen, who declined her insurance. Id. at 412. The October 30, 2010 physical examiner did not include a review of Plaintiff's medical records. Plaintiff notes that despite discounting this consultant's opinion, the ALJ

6

adopted the RFC reported by this examiner.

By January 17, 2011, Plaintiff described her leg pain as worsening more to the left than right as well as numbness in her right foot, with diminished sensation as in the toes of her left foot. Id. at 406. Dr. Nwofia advised a series of bilateral transforaminal steroid injections that Plaintiff received in her elbow every six weeks from her orthopedist. Id. at 458. Spinal fusion surgery was not recommended because "an L5-S1 fusion would likely result in the levels about wearing out [illegible] those levels would require fusion as well." Id. at 511.

From January through April 2011, Plaintiff's primary care physician prescribed anti-depressants, including Celexa and Wellbutrin. Id. at 446-47, 450, 457, 459. In April 2011, a psychologist evaluated Plaintiff for SSA and found her speech pressured and rambling with tangential thought process, blunt affect, and difficulty answering questions. Id. at 420. Plaintiff's intelligence was rated as "low average." Id. at 421.

On April 8, 2011, Plaintiff underwent a mental health consultant examination ("CE"), performed by Alice Garland, MS, LSPE, who found three moderate/marked limitations. Id. at 415-21. The ALJ did not give this examination any weight, as Alice Garland is not an acceptable medical source. Although Garland's report was co-signed by a psychiatrist, it is unclear if the psychiatrist ever examined or met with Plaintiff. Id. In April 2011, Plaintiff underwent a second series of bilateral transforaminal ESI. Id. at 399-402. On April 18, 2011, a truck struck the rear of Plaintiff's vehicle. Id. at 578. Plaintiff was transported to Skyline ER by ambulance with back and neck pain and told the emergency room doctors that she had been able to walk at the scene without difficulty, but was "just shook up." Id

In May 2011, Plaintiff's primary care physician referred her to Dr. Mohammad Ali to

evaluate Plaintiff's chronic pain, fatigue, and difficulty sleeping. Id. at 789. On examination, Dr. Ali noted, inter alia, "+paired trigger points along spine, forearms and anterior chest, [straight leg raising] slr + [left] lt leg past 30 degrees," and "bilateral lateral epicondylar tenderness." Id. Dr. Ali's diagnoses were: (1) fibromyalgia (Primary), (2) sciatica, and (3) degenerative disc disease. Id. at 790. After blood tests, Dr. Ali later confirmed his diagnosis of fibromyalgia and injected kenalog into Plaintiff's left lateral epicondyle to relieve her left elbow pain. Id. at 787-88, 790. In June 2011, Dr. Ali confirmed his prior diagnoses and prescribed Robaxin and Cymbalta for Plaintiff's underlying depression. Id. at 787-788. In May 2011, Dr. Nwofia notes Plaintiff appeared fatigued, drawn, and near tears and that her prior steroid injections had not helped. Id. at 398, 564. On May 16, 2011, Dr. Nwofia, noted, "[S]he could not tolerate the pain and the lack of sleep at night. She has been averaging 2-3 hours and then she feels very tired in the daytime." Id. at 398. Dr. Nwofia, M.D. completed two Medical Source Statements, dated June 17, 2011, id. at 601-03, and November 12, 2012, two weeks before hearing the ALJ. Id. at 639-40.

On June 11, 2011, Plaintiff was admitted to Centennial Medical Center emergency room with complaints of depression and reporting chronic pain. Id. at 495-96. Plaintiff described the anti-depressants, prescribed by her primary care physician, as unhelpful, and said "she just does not want to wake up in the morning." Plaintiff sought admmission to Parthenon Pavilion, but her insurance was not accepted. Id. at 697. The Centennial emergency room staff called the Mobile Crisis team, that transported Plaintiff to their facility, the Crisis Stabilization Unit ("CSU"), for evaluation. Id. at 496. Plaintiff left CSU against medical advice to get her medication for her chronic pain. Id. at 499.

On June 16, 2011, Plaintiff was admitted at Centerstone and diagnosed with major depressive

disorder recurrent, severe with Psychotic Features. Id. at 699. Dr. Amanda Bacchus noted Plaintiff's Global Assessment of Function ("GAF") as 42. Id. at 681-82.

In July 2011, Dr. Steven Larson, Plaintiff's orthopedic surgeon, referred her to physical therapy. Id. at 634. From July 11, 2011 through September 9, 2011, Plaintiff completed fourteen physical therapy sessions, id. at 604-638, to decrease her pain to 4/10; to decrease her headaches; to increase her cervical and lumbar range of motion (ROM) to within normal limits; to reach overhead, to the side, and out to the front; to perform housecleaning; to improve her tolerance for sitting, standing, walking; and to be able to sleep through the night. Id. at 635. Upon her discharge on September 9, 2011, Plaintiff's lumbar and cervical range of motion had increased; she was able to reach overhead, out, and to the side; and could walk for fifteen feet without difficulty. Id. at 604-06. Plaintiff's pain level, however, had not decreased to 4/10 and Plaintiff remained unable to sleep through the night; unable to stand for 30 minutes without pain; unable to sit for 60 minutes without pain; and her headaches persisted. Id. at 605.

On July 12, 2011, Plaintiff appeared at Summit Medical Center emergency room, depressed and suicidal with a prior suicide attempt. Id. at 499. Drug screen results were negative for any street drugs. Id. at 500, 503. Plaintiff was re-admitted to the Mobile Crisis facility (CSU) and was discharged on June 14, 2011 with a supply of Lamictal, Lithium, Seroquel, id. at 675, and an intake appointment at Centerstone. Id. at 685, 697.

On August 4, 2011, Plaintiff went to Summit Medical Center ER citing her depression and suicidal thoughts despite her medications. Id. at 713-14. Plaintiff had marks on her wrist with a plastic knife in the Summit ER waiting room. Id. at 719. After a negative drug test, Plaintiff was admitted to Summit's inpatient psychiatric unit for five (5) days. Id. at 709. Dr. Michael Kolek

reported Plaintiff to be "acutely depressed" with suicidal ideation and chronic low back pain. Id. at 716-17. In a mental status examination on August 8, 2011, Dr. Shahana Huda described Plaintiff's symptoms as psychomotor retardation, depressed mood, dysphoric affect, hyperverbal and circumstantial speech, impaired remote memory, poor concentration and attention, suicidal ideation, poor impulse control, and reported auditory and visual hallucinations. Id. at 716. In the discharge summary dated August 9, 2011, Dr. Shahana Huda listed Plaintiff's diagnoses as Bipolar I disorder, most recent episode mixed, severe with psychotic features, and chronic back pain, status post-surgery (2009 Laminectomy). Id. at 709. Plaintiff's psychiatric symptoms were hopelessness, insomnia, decreased energy, poor appetite, loss of interest in doing things, difficulty concentrating, and passive death wishes, thinking people were laughing at her, periods of mania, anxiety, audio and visual hallucinations. Id. at 709-10. Plaintiff's medications at discharge were Ambien, Lamictal, and Cymbalta (for psychiatric conditions) and Neurontin, Percocet, and Morphine (for chronic pain). Id. at 712.

On September 9, 2011, Plaintiff returned to her Centerstone therapist, Turner Jernigan, for follow-up treatment and stated her compliance with medications. Id. at 679. Plaintiff was consistent with her previous Centerstone diagnosis of MDD, Recurrent, Severe with psychotic features and a GAF of 42. Id. On August 8, 2011, Plaintiff received prescriptions for Effexor XR (for depression, anxiety, and panic disorder) and Trazodone (for depression, anxiety, and insomnia). Id. at 676. Plaintiff participated in individual therapy sessions from November 2011 through May 2012 with therapist Turner Jernigan, BSN, MSN, who was supervised by Dr. Pate. Id. at 663, 666, 672, 675. Plaintiff was prescribed Lithium and Lunesta for psychiatric disorders and insomnia and gabapentin [for anxiety and chronic pain]. Id. at 655-56. On July 21, 2011, Dr. Amanda Bacchus's psychiatric

evaluation was MDD, Recurrent, Severe with Psychotic Features and a GAF score of 42. Id. at 681.

In September 2011, Dr. Ali, a rheumatologist, id. at 785-86, examined Plaintiff and cited "+paired trigger points along spine, forearms and anterior chest, [straight leg raising] slr+ [left] lt leg past 30 degrees, bilateral lateral epicondylar tenderness," and he also noted "+tenderness of achilles tendon." Id. at 785. Dr. Ali's diagnoses remained: (1) fibromyalgia (Primary), (2) sciatica, and (3) degenerative disc disease. Id.

During subsequent Centerstone evaluations and therapy sessions from November 4, 2011 through May 18, 2012, Plaintiff reported continued mood swings; "real emotional crying over nothing;" insomnia; feeling overwhelmed and hopeless as well as depression and anxiety. Id. at 654-65, 667-68. Plaintiff stated, "I start stuff and I don't finish it." Her medications were changed and adjusted several times over the six (6) month period. Id. Although Plaintiff's diagnosis remained MDD Recurrent, Severe with psychotic features and her GAF score of 42 remained unchanged, Plaintiff's medications were changed during this period of time. Id.

After an early December 2011 examination and laboratory tests, Dr. Ali stated Plaintiff's fibromyalgia was "unresponsive to Cymbalta or savella...pain is still present...." Ms. Hoffman noted her pain as 8.5/10, and described "much difficulty" with walking outdoors on flat ground, bending to pick up clothing from the floor, getting in and out of a car, participating in recreational activities, getting a good night's sleep, dealing with feelings of anxiety or being nervous, and dealing with feelings of depression. Id. at 782. Dr. Ali continued Robaxin and ordered a kenalog injection for pain in Plaintiff's right ankle. Id. In addition to Robaxin, Plaintiff's medications were Percocet, morphine, Ambien, lithium, and Ultram. Id. On December 22, 2011, Plaintiff reported right elbow pain to Dr. Robert Fogolin, an orthopedic surgeon, who found positive tenderness on left epicondyle,

pain with active resisted wrist-extension – left, and decreased grip strength – right, due to pain. Id. Dr. Fogolin's assessments included: 1) lateral epicondylitis - left, and 2) pain following surgery – chronic. Id. at 773.

In April and October, 2012, Plaintiff returned to her rheumatologist for treatment of her fibromyalgia, fatigue, and insomnia. Id. at 778-81. An examination revealed fibromyalgia. Id. at 778, 781. Robaxin was continued. Id. In mid-June, 2012, Dr. Fogolin examined Plaintiff's swollen, painful right ankle, id. at 768-71, and after ordering an MRI of her right ankle, Dr. Fogolin placed Plaintiff in a CAM walker boot. Id. The MRI showed "High-grade partial tear of the peroneus brevis tendon with severe tenosynovitis."[4] Id. at 766. On June 26, 2012, Dr. Fologin advised surgery to relieve her pain as the one alternative. Id. at 764.

On July 11, 2012, Plaintiff underwent right ankle surgery: 1) open tenosynovectomy to repair her peroneal brevis tendo, and 2) right ankle open tenosynovectomy for the peroneal longus tendon. Plaintiff's right leg/ankle was in a cast for six weeks with instructions to not bear any weight on her right leg. Id. at 760-62. The pre- and post-surgical diagnoses: 1) Right ankle peroneal brevis tendon tear, and right ankle peroneal longus tenosynovitis. On July 19, 2012, her pain was moderately severe. Id. at 758. On August 21, 2012, Dr. Fogolin replaced Ms. Hoffman's cast with a CAM boot and referred her to physical therapy, id. at 754, that Plaintiff described as difficult. Id. at 752, 749.

In an August 20, 2012 session, Turner Jernigan, Plaintiff's therapist cited her recent foot

---

[4]Tenosynovitis is inflammation of the protective sheath (synovium) that covers tendons (the cord that joins muscles to the bone). The goal of treatment is to relieve pain and reduce inflammation. Rest or keeping the affected tendons still is essential for recovery. "Tenosynovitis," Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/001242.htm.

surgery and her "crying because I can't do nothing because of my foot." Id. at 656-657. Plaintiff reported sleep disturbance and dependence on others for assistance. The diagnosis was updated to MDD Recurrent, Severe without Psychotic Features, and her GAF was changed to 50.[5] On October 5, 2012, Plaintiff cited a headache that lasted three (3) days, that "I've been in a crying mood, on and off, since September." Id. at 653. Plaintiff admitted some improvement with the increased Effexor XR and her GAF increased to 55. Id. On October 10, 2012, Plaintiff's drug dependence was in "Full Sustained Remission, – 14 years." Id. at 650. On November 11, 2012, however, Plaintiff's depression worsened: "I've been really down," and she again reported passive suicidal ideations. Id. at 646. Plaintiff's medications included Effexor XR, Trazodone, lamitrigine [Lamictal], and Lunesta. Id. at 647.

In his first assessment, Dr. Nwofia noted Plaintiff's pain as severe, with her inability to lift objects over ten pounds and noted her ability as limited to sitting, standing or walking at most seven hours in a eight-hour work day without any bend or push/pull. Id. at 602, 640. In his November 12, 2012 assessment, Dr. Nwofia stated Plaintiff had to be able to change position from sitting to standing as needed, id. at 639, had to have three or more unscheduled absences from work per month due to her health, id. at 940, needed more than two unscheduled breaks during the workday, id. at 602, 640, and had to lie down for one hour 2-3 times a day. Id. at 640. Dr. Nwofia set Plaintiff's onset date as June 2011. Id.

On October 21, 2012, Plaintiff received three MBNB/facet joint injections, but her pain and

---

[5] See American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000) (noting GAF scores between 41 and 50 indicate serious symptoms), cited by Gayheart v. Comm'r of Soc. Sec., 710 F.3rd 365, 368 (6th Cir. 2013).

difficulty sleeping persisted. Id. at 409-11, 409. Plaintiff noted her pain level as 10/10, decreasing to 6/10 with medications. Id. at 407. An MRI of Plaintiff's lumbar spine and a CT Lumbar spine post-discogram in October 2012 revealed the following:

- T12-L1: minimal disc bulge.

- L/2-3: contrast is contained within the nucleus pulposus except for extension into the inner third of the annulus fibrosis posteriorly; no stenosis.

- L3-4: mild disc bulge compromising central spinal canal; bulging disc material extends into inferior neural foramina causing mild bilateral foraminal stenosis, LEFT greater than RIGHT, mild facet hypertrophy.

- L4-5: status post RIGHT laminectomy, LEFT foraminal disc protrusion resulting in mild LEFT neural foramen encroachment; moderate LEFT and RIGHT facet hypertrophy, and enhancing epidural scar. Diffuse disc bulge causing mild central stenosis.

- L5-S1: mild facet hypertrophy and spurring. Contrast is contained within the nucleus pulposus except for extension into inner third of the RIGHT posterior lateral annual fibrosis.

Id. at 504-05. In November 2012, Dr. Nwofia referred Plaintiff to a neurosurgeon for an evaluation as "a candidate for a [spinal cord stimulator] SCS trial if surgery is not an option." Id. at 507.

On November 27, 2012, Turner Jernigan, who has a master's in nursing, completed a disability assessment:

This Statement provides the opinion of Centerstone's Medical Provider as to the patient's ability to do work-related activities on a day-to-day basis in a competitive setting. This means what the patient's limitations would be if he/she were required to perform work activities 8 hours a day, 40 hours a week, 50 weeks a year on a continuous and sustained basis.

Id. at 794. Turner cited the psychiatric diagnoses of the Plaintiff as: 1) Major Depressive Disorder Recurrent, Severe without Psychotic Features; 2) Panic Disorder with Agoraphobia; her current GAF was 40. Id. at 794. Plaintiff displayed symptoms associated with her diagnoses including sleep

14

disturbance, mood disturbance, recurrent panic attacks, pervasive loss of interest, psychomoter agitation or retardation, difficulty thinking or concentrating, feelings of guilt/worthlessness, suicidal ideation or prior suicide attempts, social withdrawal or isolation, and decreased energy. Id. at 794. Jernigan's clinical findings on the severity of Plaintiff's impairments were:

> Marked anxiety and emotional distress with myself and most recent therapist on 11/12/2012 [11/14/2012]. Appearing exhausted and "crying all weekend," feeling worthless and having panic attacks. Per patient's initial [Centerstone] intake assessment on 6/16/2011, patient had recently "lost two jobs from crying and being depressed."

Id. at 795. Plaintiff's Lamictal, a psychotropic medication would cause "nausea, dizziness and headaches" and rated his prognosis for Plaintiff as "Fair," and as of November 27, 2012 can be expected to last at least twelve (12) months. Id.

Jernigan cited Plaintiff's impairments as causing her to be absent from work "more than three times a month." Id. As to Plaintiff's functional abilities due to her mental illness, Jernigan wrote:

> **ACTIVITIES OF DAILY LIVING: MARKED** [limitation] – Has extensive problems with performing daily routine activities and requires frequent assistance. At periods of worst depression, patient is dependent upon others to assist and encourage patient to meet her basic needs including with basic self-care and certainly chores and meeting other responsibilities.

> **INTERPERSONAL FUNCTIONING: MARKED** [limitation] – Has extensive problems with performing daily routine activities and requires frequent assistance. At periods of worst depression, patient is markedly isolated, and little to no interest in the company of others. Being around large groups of people, or people the patient is unfamiliar with, causes significant increased anxiety; emotional distress and need to escape.

> **CONCENTRATION, TASK PERFORMANCE, AND PACE: MARKED** [limitation] - Has extensive problems with performing daily routine activities and requires frequent assistance. At periods of worst depression, patient is unable to or has significant impairment in ability to plan and execute tasks, and requires assistance from her family.

**ADAPTATION TO CHANGE: MARKED** [limitation] – Has extensive problems with performing daily routines and requires frequent assistance. Worsened stress causes a significant deterioration in her mood, increases in her anxiety, and, in August 2011, resulted in psychiatric hospitalization.

Id. at 795-96.

The ALJ asked the vocational expert a series of hypothetical questions and in her second hypothetical question, the ALJ asked the vocational expert to assume an individual of Plaintiff's age, education and work history, who "could perform light work but would need to alternate between standing and walking and sitting every hour; can . . . frequently use the feet for foot controls; occasional postural activities; should not work around unprotected heights or other hazards." Id. at 78. The vocational expert responded that, with these limitations, the only past jobs that Plaintiff could perform "would be receptionist, motel clerk, and cashier. The other jobs would not [be able to be performed]." Id. at 78. The vocational expert described "other jobs" such as office helper, general clerk, and table worker, jobs at the light, unskilled or semi-skilled level. Id. at 78-79. The ALJ found the Plaintiff's past jobs as a receptionist, motel clerk, and cashier did not constitute "past relevant work" pursuant to the regulations. Id. at 29.

In her third hypothetical, the ALJ added two limitations that an individual would be able to perform simple and detailed but not complex tasks, and that she could adapt to only occasional changes in the workplace. Id. at 79. The accountant expert identified three of Plaintiff's past jobs – receptionist, motel clerk, and cashier – but the ALJ later concluded those jobs did not constitute "past relevant work." The ALJ later found Plaintiff's job as "cleaner" to be relevant past work. Id. at 29.

The ALJ's fourth hypothetical asked, "if we have an individual who is limited to lifting no

16

more than 10 pounds frequently; can sit for three hours; can stand and walk for four hours; would not be able to bend, push, or pull. With those limitations in mind, would the individual be able to perform past work?" Id. at 79. The vocational expert testified that an individual with these limitations would be unable to perform any of Plaintiff's past work. Id. at 80.

As to the jobs identified in hypothetical number three, the vocational expert testified that frequent unscheduled breaks during the workday would be unacceptable in that work setting and usually result in a loss of the job. Id. The vocational expert also explained that three days absence from the job "would be above the level of absenteeism that would be acceptable in any conventional work setting I'm familiar with." Id. at 82.

### B. Conclusions of Law

The Social Security Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). Judicial review is limited to whether the Commissioner's final decision is supported by substantive evidence. 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). The Court must defer to the Commissioner's decision, even if substantial evidence supports a different result. Colvin v. Barnhart, 475 F.3d 727, 730 (6th Cir. 2007) (quoting Longworth v. Comm'r of Soc. Sec. Admin., 402 F.3d 591, 595 (6th Cir. 2005)).

Plaintiff's first challenge is that the ALJ gave "little weight" to Plaintiff's treating primary treating physician, her surgeons and other providers as well as her psychiatric provider. As to her treating medical physicians, the ALJ recognized Dr. Nwofia as "claimant's doctor" or "claimant's treating doctor." (Docket Entry No. 11 at 28). Dr. Nwofia is a pain specialist who examined and treated Plaintiff regularly, often monthly, for over five years. Id. at 328-60, 365, 396-413, 506-71. Dr. Nwofia's findings are corroborated by Dr. Fogolin, Plaintiff's orthopedic surgeon, and Dr. Ali, Plaintiff's rheumatologist.

Dr. Nwofia's treatment notes refer to these clinical observations. For example: Dr. Nwofia found Plaintiff experienced persistent low-back and leg pain despite the December 1, 2009 Laminectomy and Discectomy, id. at 250, 343, and the trigger-point injections, id. at 341, as well as transforaminal epidural steroid injections, id. at 330-35, and bilateral transforaminal steroid injections, id. at 398-402, 564. Plaintiff was administered medial nerve blocks, id. at 409-11, 545-46, 542-43, multiple radio frequency lesioning procedures of her lumbar fact joint nerves in February 2010, id. at 537-38, 532-33, changes in her pain medications, including morphine, id. at 531-32, and Toradol injections. Id. at 526. Dr. Nwofia's treatment notes reflect Plaintiff sleeping poorly due to bilateral leg pain, id. at 569; waking up at 3-4 am in 6/2011, id. at 562; and left job in 2011 because "she could not tolerate the pain and the lack of sleep at night. She has been averaging 2-3 hours and then she feels very tired in the daytime." Id. at 398, 564.

After fourteen physical therapy sessions in September 2011, Plaintiff's range of motion increased, but her pain level persisted, causing Plaintiff to be unable to sleep through the night due to pain; unable to stand for 30 minutes without pain; unable to sit for 60 minutes without pain; and her headaches persisted. Id. at 605.

Plaintiff had a "spontaneous tendon rupture in the lateral ankle" in 2012 that required right ankle surgery by Dr. Fogolin, an orthopedic surgeon. Id. at 514, 523, 768-71, 760-62, 766. After this surgery, Plaintiff had to wear a right ankle strap and walked with an antalgic gait. Dr. Ali, Ms. Hoffman's rheumatologist, administered a kenalog injection for pain in Plaintiff's right ankle in late 2011. Id. at 783.

Dr. Nwofia's Treating Source Statements are supported by the diagnostic test results:

- April 22, 2010 MRI reporting, inter alia:

  Central, LEFT paracentral and neural foraminal disc bulging at L4/5. This does create some mild LEFT neural foraminal stenosis in association with facet hypertrophy. Mild concentric disc bulging and facet arthropathy at L3-L4 resulting in mild bilateral neural foraminal stenosis. Id. at 350, 336.

- July 2010 Lumbar discography, id. at 326-327, reporting, inter alia: L3/4 and L4/5 discs with complete posterior tears. Id. at 327. Dr. Nwofia summarized the discogram findings: annular tears at L3/4 and L4/5 posteriorly and bilaterally with mild to moderate foraminal stenosis. Id. at 324.

- Positive straight leg raise [SLR]- left reported, on exam, by Dr. Nwofia. Id. at 403-408. This diagnostic test result was also reported by Ms. Hoffman'|s rheumatologist, Dr. Ali ("straight leg raising [slr]+ left [lt] leg past 30 degrees"). Id. at 785, 789-790.

- Lumbar MRI scan on June 6, 2011 showing mild LEFT neural foramen encroachment L5 due to LEFT foraminal and paracentral disc protrusion, facet arthropathy at L5-S1 [the base of the spine] and some scar tissue from the 2009 Laminectomy. Id. at 504, 562.

- 10/2012 MRI – lumbar spine and CT Lumbar spine post-discogram; findings include:

  o L/2-3: contrast is contained within the nucleus pulposus except for extension into the inner third of the annulus fibrosis posteriorly. Id. at 505.

  o L3-4: mild disc bulge compromising central spinal canal; bulging disc

material extends into inferior neural foramina causing mild bilateral foraminal stenosis, EFT greater than RIGHT, mild facet hypertrophy. Id. at 504-505.

o   L4-5: status post RIGHT laminectomy, LEFT foraminal disc protrusion resulting in mild LEFT neural foramen encroachment; moderate LEFT and RIGHT facet hypertrophy, and enhancing epidural scar. Id. at 504. Diffuse disc bulge causing mild central stenosis Id. at 505.

o   L5-S1: mild facet hypertrophy and spurring. Id. at 504. Contrast is contained within the nucleus pulposus except for extension into inner third of the RIGHT posterior lateral annual fibrosis. Id. at 505.

In Gentry v. Comm'r of Soc. Sec., 741 F.3d 708 (6th Cir. 2014), the Sixth Circuit stated the

"Treating Physician Rule" as follows:

> An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim. Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 545 (6th Cir.2004). **The second standard is known as the "treating physician rule," See Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007), requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."** 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012). **The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone."** 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012). Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. Rogers, 486 F.3d at 242. In all cases, the treating physician's opinion is entitled to great deference even if not controlling. Id. The failure to comply with the agency's rules warrants a remand unless it is harmless error. See Wilson, 378 F.3d at 545-46.

Id. 723 (emphasis added). Accord, Cole v. Astrue, 661 F.3d 931 (6th Cir. 2011).

Here, the Court concludes that the ALJ erred in not deferring to Plaintiff's treating physician

or Plaintiff's physical limitations that precluded her ability to work. See Wilson, 378 F.3d at 545-46. Specialists and surgeons as well as objective medical tests support Plaintiff's treating physician's about Plaintiff's impairments with pain and restrictions on her ability to stand.

Dr. Huda's mental examination in August 2011 cited Plaintiff's poor concentration and attention, psychomotor retardation, circumstantial and hyperverbal speech, depressed mood, impaired remote memory, auditory and visual hallucinations, and suicidal ideation, and assigned a current GAF of 21-30. Id. at 716. Centerstone's Dr. Amanda Bacchus' primary diagnosis of Plaintiff was that she had Major Depressive Disorder, Recurrent, Severe With Psychotic Features, and a current GAF of 42, id. at 676-77. This diagnosis is supported by Jernigan's November 27, 2012 assessment that Plaintiff had difficulty concentrating and thinking, psychomotor agitation or retardation, decreased energy, mood disturbance, pervasive loss of interest, feelings of guilt/worthlessness, recurrent panic attacks, social withdrawal or isolation, and suicidal ideation and current GAF of 42. Id. at 794. Jernigan was Plaintiff's primary treating therapist over twelve months, from September 2011 to November 27, 2012. Id. at 670-72, 666, 663, 653-58, 646-48.

In addition, Plaintiff also cites the ALJ's rejection of Plaintiff's Centerstone records because of the electronic signature in those records. Id. at 28. From the Court's review, all of Plaintiff's Centerstone records contain electronic signatures from all treating Centerstone providers. Plaintiff's related challenge is the ALJ's rejection of a single section of Centerstone's assessment form on Plaintiff's "lowest level of functioning." Plaintiff cites the description at the beginning of the assessment form that the "overall purpose" of the Assessment was as follows:

> This Statement provides the opinion of Centerstone's Medical Provider as to the patient's ability to do work-related activities on a day-to-day basis in a competitive setting. This means what the patient's limitations would be if he/she were required to perform work activities 8 hours a day, 40 hours a week, 50 weeks a year on a

continuous and sustained basis.

Id. at 794.

Upon review of the record, the Court agrees that the ALJ's stated reasons for rejecting Plaintiff's treating physicians and the Centerstone records were erroneous. Moreover, the ALJ must consider Plaintiff's impairments, alone and in combinations. Malone v. Commissioner of Social Sec., 507 Fed. Appx. 470, 472 (6th Cir. 2012). The administrative record reveals that Plaintiff's physical and mental impairments, alone or in combination, render her unable to perform light work. A GAF of 42 or 50 indicates a person's overall psychological functioning that reflects severe symptoms or serious impairment in social or occupational functioning. Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 368 (6th Cir. 2013) (citing White v. Comm'r of Soc. Sec., 572 F.3d 272, 276 (6th Cir. 2009) (explaining the import of GAF scores)); American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000) (noting that GAF scores between 41 and 50 indicate serious symptoms).

Plaintiff next contends that the ALJ's finding that Plaintiff was capable of performing her past relevant work as a "cleaner," Docket Entry No. 11 at 29, is unsupported by the testimony of the vocational expert. Id. at 78-79. For this finding, the ALJ relied upon her third hypothetical question to the vocational expert who testified that Plaintiff's past work as a "cleaner" could not be performed with Plaintiff's limitations under the DOT. Id. at 78, 80. Upon review of the vocational expert's testimony and given Plaintiff's combined impairments and demonstrated work history, the Court agrees with Plaintiff that the ALJ's interpretation of the vocational expert's testimony is erroneous. See SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000) ("Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions").

For these collective reasons, the Court concludes that Plaintiff's motion for judgment on the record (Docket Entry No. 26) should be granted and Plaintiff awarded benefits.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of October, 2014.

WILLIAM J. HAYNES, JR.
United States District Judge